Filed 1/4/21  P. v. Whitby CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WINNIE PERRY WHITBY,<br><br>    Defendant and Appellant. | D076009<br><br><br><br>(Super. Ct. No. SCE385028)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on December 21, 2020, be modified as follows:

1. On page 8, at the end of the first sentence of the first full paragraph, add the following footnote, which will require renumbering of all subsequent footnotes:

   Melissa's remains were ultimately released to her family after a 30-day waiting period.

2. On page 8, second full paragraph, delete the language "A month and a half" and replace with "Shortly after" to read as follows:

Shortly after Melissa's body was discovered, the defendant left Jamul and moved in with his high school girlfriend in another state.

The petition for rehearing is denied.

There is no change in judgment.

McCONNELL, P. J.

Copies to: All parties

2

Filed 12/21/20  P. v. Whitby CA4/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WINNIE PERRY WHITBY,<br><br>    Defendant and Appellant. | D076009<br><br><br><br>(Super. Ct. No. SCE385028) |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge.  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Defendant Winnie Perry Whitby appeals a judgment of conviction entered after a jury found him guilty of the second degree murder of his wife, Melissa Whitby (Melissa) (Pen. Code, § 187, subd. (a); count 1),[1] and found true an allegation that he personally used a deadly weapon—a knife—in the commission of the murder (§ 12022, subd. (b)(1)).  He argues the judgment must be reversed because:  (1) the evidence was insufficient to support the conviction, (2) the trial court erred in admitting evidence of uncharged conduct and domestic abuse perpetrated by the defendant, and (3) the trial court committed instructional error.

We affirm the judgment.

# II

# BACKGROUND

## A

### *Overview*

The defendant and Melissa were married.  They lived in a mobile home in Jamul, a rural and mountainous area of San Diego County.  Although they lived in the same mobile home, they slept in separate rooms and maintained separate banking accounts.  According to the defendant, he and Melissa had a "loose marriage" and "didn't really check in on each other."

Melissa worked as a registered nurse at a skilled nursing facility and the defendant worked as a general laborer at an animal park.  Due to the nature of the defendant's work, the defendant carried two knives on his person every day.  One knife was a five-inch hunting knife the defendant kept in a sheath on his hip.  The other knife was a pocket knife.

---

[1]    All statutory references are to the Penal Code unless otherwise noted.

On December 30, 2016, Melissa did not show up for her scheduled work shift.  Eight days later, Melissa's body was discovered at a nearby trailhead. Melissa had been stabbed to death.

B

*Prosecution Case*

1

*The Defendant's Allegations Concerning Melissa*

In January 2016, eleven months before Melissa's disappearance, the defendant placed three calls to 911 during which he made several bizarre allegations about Melissa.  During the first call, he told the operator he needed to "press charges" because his wife was posting images of his "body parts" online and he was in danger.  He said his wife was an "obvious voyeur," had "hidden cameras," and "set [him] up for sexual abuse."  He stated she was "probably running some scams" and was "up to a whole lot more."  The defendant said his wife was not at home, but there would be a "confrontation" if she returned home.  He assured the operator he was "completely sane" and hoped he "came across sane enough …."  Law enforcement officers did not visit the Whitbys' mobile home in response to the 911 call, but they placed return calls to the defendant that went unanswered.

The defendant placed the second 911 call the next day.  He told the operator his wife despised him, planned "foul play" against him, and was "sneaking pictures" of him, posting the photographs online, and "baiting queers with them."  He stated she doctored the photographs to cover up his distinguishing features, namely his tattoos, but he had "software" that enabled him to see "where [his] tattoos ha[d] been camouflaged."  The defendant said his wife was "prostituting for herself" and "running a number of scams," and he "went through this with [his] ex-wife, who was doing porn

3

…." He stated he was "very upset," believed he was in danger, and was a "sane, rational person." Law enforcement officers did not visit the Whitbys' mobile home in response to the defendant's second 911 call.

The defendant placed the third 911 call two days later. During the call, the defendant stated he was being "harassed," "threatened," and "abused." He told the operator his wife was "completely insane" and was "escalating and escalating." He also stated she was "recruiting" online for "some sort of attack." When the operator asked for the defendant's name, the defendant apologized, stated he would "handle [it] a different way," and ended the call.

The defendant made similar allegations about Melissa to his coworkers. One coworker testified the defendant frequently called Melissa a bitch and said she was a prostitute and a drug runner for the Mexican Mafia gang. According to the coworker, the defendant said he found pictures of "photoshopped genitalia" on Melissa's laptop and she "was trying to have him killed …." A second coworker testified the defendant believed Melissa was going to kill him, sometimes slept in the garage because he was afraid of Melissa, and stated he "had to hide the knives" from Melissa.

During the investigation into Melissa's death, law enforcement officers reviewed Melissa's cell phone, laptop, internet browsing history, and social media account. They found no indication that she was affiliated with the Mexican Mafia or any other gang, had a romantic or sexual relationship with a person other than the defendant, or participated in pornography, prostitution, drug smuggling, or the posting of nude photographs online.

2

*The Fight and Reconciliation*

In April 2016—three months after the defendant's 911 calls—Melissa called a friend early one morning. According to the friend, Melissa was

"hysterically crying" and she said the defendant emptied her bank account, got into an argument with her, and pushed her to the ground. Melissa stated she and the defendant then got into a vehicle and starting driving. During the drive, the defendant "threaten[ed] to drive the car off the mountain." The defendant and Melissa drove to the airport where the defendant, but not Melissa, boarded a one-way international flight with no apparent plan to return.

Two or three months later, the defendant reconciled with Melissa and moved back in with her in Jamul.

### 3

### *Melissa's Disappearance*

On the afternoon of December 29, 2016, Melissa's boss called and spoke with Melissa. She told Melissa not to come into work that day because the skilled nursing facility was overstaffed. Melissa's boss reminded Melissa she was still scheduled to work the following day.

On December 30, 2016, Melissa did not show up for her scheduled work shift. Melissa's boss and coworkers called her and sent text messages to her, but received no response. One coworker sent a text message to the defendant stating Melissa did not show up to work and asking whether she was okay. The defendant sent a text message back stating Melissa was not at home that morning. The coworker then asked the defendant when he last saw Melissa. The defendant replied, "Last night she talked about seeing [a movie]. She was home when I left and gone when I got back."

Melissa's coworkers contacted hospitals and the sheriff's department out of concern for Melissa, which led to a welfare check at the Whitbys' mobile home later that evening. During the welfare check, the defendant told the patrol deputy the last time he saw Melissa was at the mobile home the

5

prior evening. The defendant said he left to go to a motorcycle shop at approximately 8:00 p.m. and Melissa was gone when he returned at approximately 11:30 p.m. He stated he had not tried to contact her, but, at the patrol deputy's request, he would try to contact her.

After the welfare check, the defendant sent a single text message to Melissa—the only text message he sent to her after her disappearance. The text message read, "Hey baby. The cops were here. We are all worried about you. Are you okay? Please answer. Me and [the Whitbys' pet] bird love you." Cell phone records indicate the defendant placed just one phone call to Melissa's cell phone following her disappearance, on January 2, 2017.

Over the next week, law enforcement officers interviewed the defendant and conducted walkthroughs of the mobile home. During the interview, the defendant maintained that he last saw Melissa on the evening of December 29, 2016. He stated she had the evening off work and wanted to see a movie, but he was not sure whether she went to see the movie. He said he left the mobile home at 8:00 p.m. to price a tire at a motorcycle dealership, get gas, buy tobacco, and ride his motorcycle, and Melissa was gone when he returned home after 11:00 p.m. During the walkthroughs of the mobile home, law enforcement officers observed the defendant's motorcycle had a bald tire. They also observed the defendant had a cut on his right pinkie finger.

#### 4

#### *The Discovery of Melissa's Body*

On January 7, 2017, witnesses found Melissa's body near a trailhead two miles from the Whitbys' mobile home. She had multiple stab wounds and cuts on her face, chest, neck, and the back of her head, and had bled to death. A swab taken from one of Melissa's hands revealed a DNA mixture of two

contributors—Melissa and the defendant. There was no indication Melissa had been sexually assaulted.

The area in which Melissa's body was found was an illegal dumping site. The body was located near 30 to 40 garbage bags, which contained yard waste and other refuse. Law enforcement officers collected items from the area, including a blue tarp. The tarp had DNA from two contributors on it, but the DNA samples that were collected were too low-level to perform a DNA comparison.

A few hours after Melissa's body was discovered, Melissa's vehicle was found abandoned on a residential street a few miles away. The vehicle was unlocked, the vehicle keys were on the front driver side floorboard, and Melissa's cell phone and purse—which contained her checkbook, wallet, and money—were on the rear passenger side floorboard. Melissa's blood was on the vehicle's rear bumper and rear driver side light cover.

5

*Events Following the Discovery of Melissa's Body*

The next morning, law enforcement officers executed a search warrant of the mobile home. They seized seven folding and camping-style knives from the defendant's room. They also located and photographed a blue tarp that resembled the tarp found near Melissa's body.[2]

Law enforcement officers executed warrants for the defendant's bank records. According to these records, the defendant's bank card was used to make purchases at a nearby cigar shop and a nearby gas station on the night Melissa disappeared. Transaction records indicate the purchases were made shortly after 5:00 p.m. Officers were unable to confirm whether the

---

[2] Officers did not seize the tarp from the mobile home. When they realized their mistake and returned to the mobile home two months later, the tarp was no longer there.

defendant visited the motorcycle shop. However, they determined from the motorcycle shop's website that the motorcycle shop closed at 7:00 p.m. on the evening in question, an hour before the defendant purportedly left the mobile home.

Despite repeated requests from Melissa's family members, the defendant did not claim Melissa's remains or authorize her remains to be released to her family. A funeral was held for Melissa in San Diego, but the defendant did not attend.

A month and a half after Melissa's body was discovered, the defendant left Jamul and moved in with his high school girlfriend in another state.

6

*Defendant's Ex-Wife (J.B.)*

Prior to his marriage with Melissa, the defendant was married for 15 years to J.B., with whom he had a daughter. J.B. testified the defendant displayed paranoia throughout their marriage. She testified he was paranoid that certain of their friends and family members were in the mafia or in biker gangs. She also testified the defendant always carried a butterfly knife on his person and kept knives in his vehicle and at their home.

J.B. testified about two incidents from their marriage in which the defendant threatened her. J.B. testified that on one occasion, she wanted to leave the defendant and he told her she could leave, but he would kill her if she took their daughter away. J.B. testified she did not leave the defendant because he owned a revolver and she believed the defendant would follow through with his threat.

J.B. testified the defendant confronted her on another occasion and falsely accused her of engaging in pornography. She testified he was "very upset," showed her pictures of women that did not look like her, and refused

8

to believe her when she told him the women in the pictures were not her. J.B. testified she awoke that night and found a firearm under a pillow. She testified she asked the defendant what the firearm was for and he said, "For you." J.B. testified she asked what the defendant meant and he said she could not be trusted and he needed to protect himself from her. J.B. testified she "felt unsafe" around the defendant, got herself and her daughter out of the house, called the police, and obtained a restraining order against the defendant.

In May 2017, four months after Melissa's body was discovered, the defendant showed up unannounced at J.B.'s out-of-state residence. J.B. testified the defendant stated he wanted to see their daughter. J.B. testified she was "really scared" and feared the defendant would try to enter the house and kill her and possibly their daughter. J.B. testified she armed herself with a knife, told the defendant to get off her property, and stated she would kill him if he tried to come inside the residence. J.B. testified she also told the defendant, "I know what you did to your wife," and the defendant replied, "What did you want me to do? She was with the Mexican Mafia."[3] J.B. testified the defendant stayed outside the residence for a few minutes and left without further incident.

## C

### *Defense Case*

The defense cross-examined the People's witnesses and elicited testimony from one witness. The defense witness testified he was driving in Jamul on January 2, 2017, and observed a truck backed into the pullout area where Melissa's body was later discovered. The defense witness did not see

---

[3]    In her report to detectives, J.B. stated she told the defendant, "I know what you did to her. I know you killed your fuckin' wife."

people in or around the vehicle and did not know the license plate number for the truck.

## III

## DISCUSSION

## A

### *Sufficiency of the Evidence*

"Murder is the unlawful killing of a human being or a fetus 'with malice aforethought.' [Citation.] Defendant was convicted of second degree murder, which is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Craven* (2012) 53 Cal.4th 500, 507.) The defendant challenges his murder conviction on grounds that the evidence was insufficient to establish beyond a reasonable doubt that he killed Melissa.

" 'When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Our review must 'presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' [Citation.] Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' "be reasonably reconciled with the defendant's innocence." ' [Citations.] The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

10

We conclude substantial evidence supported the defendant's murder conviction. The record discloses evidence of the defendant's motive, which is not a necessary element, but "is relevant, and a strong motive provides powerful evidence" the defendant committed the charged crime. (*People v. Moore* (2016) 6 Cal.App.5th 73, 85 (*Moore*).) During 911 calls and conversations with coworkers, the defendant divulged that he felt he was in danger because he believed Melissa engaged in pornography and was a prostitute and a drug runner for a gang. He also expressed concerns that Melissa was surreptitiously taking nude photographs of him, doctoring the photographs, and posting the photographs online. The defendant stated he was even afraid to sleep in the same house as Melissa and believed he needed to "hide the knives" from her. From this evidence, a competent jury could conclude the defendant killed Melissa out of an unfounded concern that she was violating his privacy interests, endangering him, and/or planning to harm him.

The People did not produce the murder weapon at trial, but it was undisputed Melissa suffered fatal stab wounds from a knife. Substantial evidence demonstrated that the defendant habitually possessed and carried knives of various types. For instance, the record discloses evidence that the defendant regularly carried at least one or two knives and had a large cache of knives stored in the isolated mobile home he shared with Melissa, which was located just two miles from where Melissa's body was found. Additionally, there was evidence the defendant had a cut on his finger shortly after Melissa's disappearance. Based on the defendant's practice of carrying knives, his possession of knives in the remote mobile home in which he and Melissa lived, and the close geographic proximity of the mobile home to the

11

area where Melissa's body was discovered, a reasonable jury could conclude the defendant had the means and opportunity to kill Melissa.

Further, no witnesses testified as to the defendant's whereabouts on December 29, 2016, the date of Melissa's disappearance. Although the defendant told officers he parted ways with Melissa at 8:00 p.m. to price a tire, get gas, buy tobacco, and ride his motorcycle, the record contains evidence from which a reasonable jury could find these were false alibis. Transaction records from the cigar shop and the gas station, as well as the posted store hours for the motorcycle shop, indicate the defendant visited these locations, if at all, several hours earlier than he claimed. "Evidence the defendant used a false alibi is relevant to prove consciousness of guilt." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1029; see *People v. Kaurish* (1990) 52 Cal.3d 648, 682 ["Evidence showing that defendant made false statements at the time of his arrest is admissible to show consciousness of guilt."].)

Evidence of the defendant's statements to his ex-wife, J.B., supported the conviction as well. According to J.B., the defendant appeared at her residence just a few months after Melissa's body was discovered. J.B. testified she told the defendant she knew "what [he] did to [his] wife" and, in response, he stated, "What did you want me to do? She was with the Mexican Mafia." The jury reasonably could infer the defendant's statement—in which he attempted to justify "what [he] did to [his] wife"—was an adoptive admission that he killed Melissa.

The defendant disputes whether it was reasonable for the jury to interpret his statement as an adoptive admission that he killed Melissa, claiming J.B.'s accusations were simply too ambiguous to infer such an admission. He postulates that J.B. might have been accusing him of some other misconduct—for example, draining Melissa's bank account—and that

12

he was merely trying to justify *that* behavior. We are not persuaded. J.B. did not specify the precise misconduct underpinning her accusation. However, J.B. was in a visible state of terror and armed with a knife at the time she made her accusation against the defendant. Melissa's body had been found just a few months prior and her killer remained on the loose. Further, J.B. testified her intent in making the accusation was to convey that she knew the defendant killed Melissa. Given this context, we do not believe there was anything ambiguous about the nature of J.B.'s accusation against the defendant. At minimum, a reasonable jury could infer that the defendant understood J.B. was accusing him of killing Melissa.

Finally, evidence of the defendant's propensity to commit domestic violence supported the conviction. As discussed below, see *post* Part III.B, there was testimony the defendant, in the past, pushed Melissa to the ground in the heat of an argument, threatened to drive Melissa off a mountain, told J.B. he would kill her, and told J.B. he had a firearm "for [her]." He also threw items and punched holes in walls during bouts of anger. These acts tended to show the defendant was prone to commit domestic violence, "and, based on that propensity, that he was likely to, and did in fact commit the charged crime." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 539 (*Kerley*).)[4]

The defendant argues the evidence was insufficient to support the conviction because the record lacks certain evidence sometimes introduced in a criminal prosecution, such as fingerprint evidence and eyewitness testimony. While such evidence might have made the case against the defendant even more compelling, it is not our role to reweigh the evidence or speculate as to what additional showing the People might have made to

---

[4]    Prior acts of domestic violence can be received in a murder prosecution because "murder is 'the ultimate form of domestic violence ….' " (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1237 (*Brown*).)

further strengthen their case.  (See *People v. Story* (2009) 45 Cal.4th 1282, 1299 [an appellate court "err[s] in focusing on evidence that [does] not exist rather than on the evidence that [does] exist"].)  Rather, our duty is to consider whether the record—viewed in the light most favorable to the judgment—contains evidence that is reasonable, credible, and of solid value, such that a jury could find the defendant guilty of the charged crime.  For all the reasons just discussed, we conclude the record contains such evidence.

B

*Evidentiary Rulings*

The defendant argues the trial court erred in admitting evidence of uncharged domestic violence he perpetrated against Melissa and his ex-wife, J.B., as well as statements he made to J.B. prior to one of the domestic violence incidents.  He claims the evidence was impermissible character evidence admitted in violation of Evidence Code section 1101, subdivision (a), and subject to exclusion under Evidence Code section 352.  We conclude the evidence was properly admitted.

# 1

## *Legal Principles*

In general, character evidence, sometimes known as evidence of a propensity or disposition to engage in a type of conduct, is inadmissible to prove a defendant's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) However, this general rule does not prohibit the admission of evidence relevant "to prove some fact ... other than [a person's] disposition to commit such an act," including a person's "motive, opportunity, intent, preparation, plan, knowledge, [or] identity." (*Id.*, § 1101, subd. (b).) We review a trial court's admission of evidence under Evidence Code section 1101 for abuse of discretion. (*Moore, supra*, 6 Cal.App.5th at p. 92.)

Evidence Code section 1109 sets forth an exception to the general rule against the admission of propensity evidence. In an action in which the defendant is accused of an offense involving domestic violence, Evidence Code section 1109 " 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' " (*Kerley, supra*, 23 Cal.App.5th at p. 531.) Evidence Code "[s]ection 1109 'reflects the legislative judgment that in domestic violence cases … similar prior offenses are "uniquely probative" of guilt in a later accusation.' " (*Ibid.*) We review the admission of domestic violence evidence for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

Even if evidence is otherwise admissible, it still may be excluded pursuant to Evidence Code section 352. Under Evidence Code section 352, a court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A ruling on the admissibility

15

of evidence under Evidence Code section 352 " ' "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 330.)

2

*Evidence Pertaining to Melissa*

Prior to trial, the People moved in limine to admit evidence that the defendant and Melissa got into an altercation in the spring of 2016, during which the defendant pushed Melissa to the ground and threatened to drive himself and Melissa off a mountain. The People argued it was admissible as domestic violence evidence under Evidence Code section 1109. The trial court granted the motion in relevant part, permitting the People to elicit testimony from Melissa's coworker about the altercation. The defendant contends the court erred because his conduct did not constitute domestic violence within the meaning of Evidence Code section 1109.

Evidence Code section 1109, subdivision (d)(3), defines domestic violence as having the meaning set forth in Penal Code section 13700 and, for acts that occurred within five years of the charged offense, as having the further meaning set forth in Family Code section 6211. Under Penal Code section 13700, subdivision (b), domestic violence means "abuse committed against an adult or a minor who is a spouse[] [or] former spouse …." Family Code section 6211 defines domestic abuse as "abuse perpetrated against," among other persons, a spouse or former spouse. It is uncontested Melissa was the defendant's spouse. Therefore, the relevant question here is whether the defendant's conduct amounted to *abuse* perpetrated against Melissa.

To answer this question, we turn to the definitions of abuse set forth in Penal Code section 13700, subdivision (a), and Family Code section 6203.

16

Under Penal Code section 13700, subdivision (a), abuse is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." And, under Family Code section 6203, abuse means "[t]o intentionally or recklessly cause or attempt to cause bodily injury," "[s]exual assault," "[t]o place a person in reasonable apprehension of imminent serious bodily injury to that person or to another," or "[t]o engage in any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320."[5] (Fam. Code, § 6203, subd. (a).)

The trial court did not err when it determined the defendant's prior conduct, if proven by a preponderance of the evidence, constituted abuse under these definitions. When the defendant shoved Melissa to the ground during their fight, he intentionally or recklessly attempted to injure her, placed her in reasonable apprehension of imminent serious bodily injury, and engaged in behavior (molesting, attacking, striking, and battering) that could be enjoined by court order. Further, when the defendant stated he would drive Melissa off a mountain, he engaged in conduct that would place Melissa in reasonable apprehension of imminent serious bodily harm and engaged in behavior (threatening) that could be enjoined by court order.

The defendant claims his prior conduct could not constitute domestic violence because the People did not proffer, and Melissa's coworker did not ultimately testify, that Melissa suffered injuries during the incidents. However, given the broad statutory definitions of domestic violence, a victim

---

5    Family Code section 6320, subdivision (a), permits a court to enjoin a party "from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating …, falsely personating …, harassing, telephoning …, destroying personal property, contacting, … coming within a specified distance of, or disturbing the peace of the other party … [and] of other named family or household members."

of domestic violence need not suffer bodily injury for domestic violence to occur. As noted, domestic violence can occur when a person *attempts* to injure the victim, places the victim in *fear* of bodily injury, or engages in behavior that can be enjoined by court order—actions that do not necessarily entail actual bodily injury. (Pen. Code, § 13700, subds. (a), (b); Fam. Code, §§ 6203, subd. (a), 6211.) Thus, whether Melissa suffered injuries from the defendant's conduct is not determinative of whether domestic violence took place. (See *People v. James* (2010) 191 Cal.App.4th 478, 483 [defendant's act of breaking down a door and threatening the victim involved domestic violence].)

The defendant also argues his conduct did not constitute domestic violence because there was no indication the defendant's conduct caused Melissa to fear for her safety. The record discloses otherwise. According to Melissa's coworker, Melissa was very upset, "hysterically crying," and needed to be calmed down after her confrontation with the defendant. From this evidence, it can be inferred the defendant's conduct—shoving Melissa and threatening to drive her off a mountain—placed Melissa in reasonable apprehension of imminent serious bodily harm. Insofar as the defendant suggests domestic violence evidence can be admitted only if the victim explicitly voices her fears, we decline to read this requirement into Evidence Code section 1109, which contains no such limitation. (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1195 (*Merchant*) [the domestic violence inquiry "does not turn on whether there was evidence 'about how [the victim] felt' during the incident"].)

Next, we consider whether the trial court abused its discretion in declining to exclude the uncharged domestic violence evidence pursuant to Evidence Code section 352. We conclude the court did not err. The

18

uncharged domestic violence was highly probative of the defendant's propensity to commit domestic violence such as the charged offense. (*Kerley, supra*, 23 Cal.App.5th at p. 535 ["[I]n domestic violence cases in particular, a history or pattern of domestic violence is very probative."]; see *Brown, supra*, 192 Cal.App.4th at p. 1237 ["A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder."].) The uncharged domestic violence evidence was especially relevant given that the uncharged domestic violence and the charged offense occurred relatively close in time—within one year of one another.

Given this high degree of relevance, the court acted within its discretion in finding that other considerations did not substantially outweigh the probative value of the evidence. The testimony concerning the uncharged domestic violence was brief, filling just five pages of the reporter's transcript. It was damaging to the defendant insofar as it established his propensity to commit domestic violence, but there is no indication it resulted in *undue prejudice* warranting exclusion under Evidence Code section 352—i.e., prejudice that " ' " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205.) Finally, the uncharged domestic violence—though disturbing—was not as inflammatory as the brutal stabbing and killing of Melissa for which the defendant was charged. On this record, we discern no abuse of discretion.

### 3

*Evidence Pertaining to J.B.*

i

*Uncharged Domestic Violence*

The People also moved in limine to admit evidence that the defendant: (1) told J.B. he would kill her if she left with their daughter, (2) kept a firearm under a pillow and, after a confrontation between the defendant and J.B., told J.B. the firearm was "for [her]," and (3) punched holes in walls and threw items when he was angry. The trial court found the evidence was admissible as prior domestic violence evidence under Evidence Code section 1109, conducted what it described as an "extensive 352 analysis," and granted the People's motion in relevant part.

As we will discuss later in the opinion, the defendant contends the uncharged conduct did not constitute domestic violence under Evidence Code section 1109. See *post* Part III.C.2. But, for purposes of the defendant's specific challenge to the trial court's in limine ruling, the defendant does not dispute whether the uncharged conduct amounted to domestic violence. Instead, he argues only that the court abused its discretion in admitting the evidence under Evidence Code section 352. He asserts the evidence had minimal probative value, if any, because the uncharged conduct was dissimilar to the charged offense. We are not convinced.

The evidence of domestic violence against J.B. was sufficiently similar in nature to the charged offense and, furthermore, highly probative of the defendant's propensity to commit domestic violence. During two of the prior domestic violence incidents, the defendant impliedly threatened to use a deadly weapon against his ex-wife and explicitly threatened to kill his ex-wife. For purposes of the charged offense, the People theorized the defendant

20

*in fact* used a deadly weapon against his wife and *in fact* killed his wife. Thus, the threats the defendant made against J.B. plainly bear important similarities to the charged offense. While the defendant's throwing of items and punching of walls bears less similarity to the charged offense, the simple fact that the defendant engaged in domestic violence on multiple occasions against different spouses had some relevance to establish his propensity to commit domestic violence. (See *Merchant, supra*, 40 Cal.App.5th at p. 1194 ["the fact that [the defendant] engaged in domestic violence against two different women *strengthens* its probative value on propensity"].)

Given these conclusions, we believe the court's admission of the prior domestic violence evidence did not amount to an abuse of discretion under Evidence Code section 352. Just five pages of the reporter's transcript were devoted to the topic. The prior domestic violence against J.B. was less inflammatory than the charged offense of murder. Additionally, it is apparent from the record the trial court parsed through each instance of uncharged domestic violence with great care before it made its admissibility determinations. Taking all these factors into account, we conclude the court acted within its discretion when it admitted the uncharged domestic violence evidence at issue.

ii

*Statements Concerning Pornography and the Mafia*

The People moved in limine to admit evidence that the defendant—prior to telling J.B. he had a firearm "for [her]" and needed to "protect" himself from her—accused J.B. of engaging in pornography and having familial ties to the mafia. The People argued these statements were admissible under Evidence Code section 1101, subdivision (b), to establish the defendant's motive and intent to kill Melissa, his identity as Melissa's

21

killer, and the existence of a plan or scheme. The court admitted the statements as evidence of motive.

The defendant claims the trial court erred in admitting his statements because the uncharged act that took place after the defendant's statements (the defendant's implied threat against J.B.) was not sufficiently similar to the charged offense (the killing of Melissa). Given these alleged dissimilarities, the defendant claims the proffered evidence had no tendency to show he had the same motive when he committed both the uncharged act and the charged offense.

There are "two different types or categories of motive evidence. In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, the charged crime is effect.' [Citation.] 'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive.... [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both [acts] are explainable as a result of the same motive.*'" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.) The evidence concerning the defendant's paranoid beliefs, statements, and accusations about J.B. fell within the second category of motive evidence.

We conclude the trial court did not abuse its discretion in admitting such evidence as relevant to prove the defendant's motive for killing Melissa. If believed by the jury, the evidence showed the defendant harbored paranoid and untrue suspicions that his then-wife (J.B.) engaged in pornography and had affiliations with organized crime and, as a result, the defendant committed the uncharged act of threatening to kill her. Such evidence was directly relevant to show that the defendant committed the charged act of murder because he developed similar paranoid suspicions that his current wife (Melissa) engaged in pornography and was affiliated with organized

22

crime. In other words, the evidence at issue was relevant to establish the defendant possessed the same motive when committing both the uncharged act (impliedly threatening J.B.) and the charged offense (murdering Melissa).

The defendant notes that he never inflicted physical injuries on J.B., whereas physical injuries were inflicted on Melissa, and he argues this dissimilarity precludes any inference that he had the same motive in both instances. We do not believe this difference precluded such an inference. Prior to both the uncharged act and the charged offense, the defendant formed and voiced virtually identical mistrustful beliefs about his spouse. In both instances, he then engaged in substantially similar conduct—either *threatening to use* a deadly weapon against his spouse or *using* a deadly weapon against his spouse. Based on these striking similarities, we have no trouble concluding the evidence was relevant to prove the defendant's motive.[6] (See *People v. Davis* (2009) 46 Cal.4th 539, 560–562, 604 [evidence the defendant abducted, burglarized, and assaulted adult victims was admissible to prove motive in sexual assault of minor decades later].)

The court also acted within its discretion when it declined to exclude the evidence under Evidence Code section 352. " 'In a case where the identity of a person who commits a crime is attempted to be proven by circumstantial evidence, such as in the case at bar, evidence of a motive on the part of a defendant charged is always a subject of proof, and the fact of motive particularly material.' " (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 896.) Because the chief contested issue at trial was the identity of Melissa's killer and the proffered evidence tended to establish the defendant had a motive for killing Melissa, we conclude the evidence was highly probative.

---

[6] Because we conclude the evidence was admissible to prove the defendant's motive, we do not consider whether it was admissible to establish another fact, such as intent, identity, common plan, or opportunity.

23

Further, the probative value of the evidence was not substantially outweighed by other factors. J.B.'s testimony concerning the defendant's paranoid accusations spanned less than five pages of the reporter's transcript. It is unlikely the evidence confused or misled the jury; on the contrary, it likely provided helpful context for the domestic violence incidents involving the defendant and J.B. Further, the testimony was not so unduly prejudicial as to evoke an emotional bias against the defendant. For all these reasons, we conclude the trial court properly exercised its discretion in admitting the evidence concerning the defendant's accusations about J.B.

C

*Instructional Errors*

The defendant contends the trial court committed reversible error by providing the jury the following pattern jury instructions: (1) CALCRIM No. 375, which pertains to uncharged conduct committed by the defendant, and (2) CALCRIM No. 852, which concerns uncharged domestic violence perpetrated by the defendant. As explained below, we disagree.

1

*Legal Principles*

" 'The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.] "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. [Citation.]" [Citation.]' " (*People v. Alexander* (2010) 49 Cal.4th

24

846, 920–921.) We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

2

*CALCRIM No. 375 (Uncharged Conduct)*

The trial court instructed the jury with CALCRIM No. 375, a pattern jury instruction pertaining to uncharged conduct. The instruction identified three categories of evidence concerning uncharged conduct: (1) the defendant's habit of carrying knives; (2) the defendant's beliefs that people were involved in the mafia; and (3) the defendant's beliefs that J.B. was engaged in pornography. Then, it stated the jury may consider such evidence—if it found the defendant engaged in these behaviors—to determine whether: "The defendant was the person who committed the offense alleged in this case; [¶] or [¶] The defendant acted with the intent to kill; [¶] or [¶] The defendant had a motive to commit the offense alleged in this case; [¶] or [¶] The defendant had a plan or scheme to commit the offenses alleged in this case; [¶] [o]r [¶] The defendant had the opportunity to commit the charged offense." Defense counsel objected to the instruction's references to motive and plan or scheme, but not its references to identity, intent, or opportunity.

The defendant presents two arguments as to why CALCRIM No. 375 was erroneous. First, he asserts the uncharged conduct evidence could not be used to prove *any* of the facts identified in the instruction—i.e., to prove identity, intent, motive, plan or scheme, or opportunity. He argues, therefore, the instruction was improper in its entirety. Alternatively, he claims each category of uncharged conduct evidence could be used to infer only some, but not all, of the facts identified in the instruction. Relying on the disjunctive phrasing of the instruction, he asserts the instruction was misleading and ambiguous because it permitted the jury to draw inferences

25

regarding *all five* facts (identity, intent, motive, plan or scheme, or opportunity) from *all three* categories of uncharged conduct evidence.

Assuming the defendant preserved his arguments for our consideration, and further assuming CALCRIM No. 375 was ambiguous, misleading, or erroneous, we conclude any error was harmless. As noted, the evidence of the defendant's beliefs regarding J.B.'s involvement with the mafia and pornography was *admissible* to establish his motive for killing Melissa. (See *ante* Part III.B.3.i.) The evidence of the resulting domestic violence he perpetrated against J.B. was *admissible* under Evidence Code section 1109. (See *ante* Part III.B.3.ii.) And the evidence of the defendant's knife-carrying habit was relevant, and *admissible*, to show he had an opportunity to kill Melissa. (See *ante* Part III.A.) Thus, the prior conduct evidence was *admissible* and properly before the jury, regardless of whether it was *relevant* to the specific issues of identity, intent, or a plan or scheme.

Further, the record contains compelling circumstantial evidence establishing the defendant's identity as Melissa's killer, which was the primary disputed issue at trial. This showing consisted of evidence that the defendant impliedly admitted to J.B. that he killed Melissa, provided false alibis to law enforcement, had a propensity to commit domestic violence (including against Melissa), and had a motive for killing Melissa (his paranoid beliefs that she posed a threat to him). (See *ante* Part III.A.) Other circumstantial evidence tended to establish the defendant was the killer as well, including the cut on the defendant's finger and the similarities between the tarp at the defendant's mobile home and the tarp at the place where Melissa's body was found.

Finally, CALCRIM No. 375 stated the defendant's uncharged conduct was "only one factor to consider along with all other evidence." It stated the

26

uncharged conduct was "not sufficient by itself to prove that the defendant [was] guilty of the charged crime …." We presume the jury followed the instruction and based the conviction on all the evidence, not merely the evidence the defendant had a habit of carrying knives and had paranoid beliefs about J.B. (*People v. Fayed* (2020) 9 Cal.5th 147, 192.)

For all these reasons, we conclude it is not reasonably probable the defendant would have obtained a more favorable result in the absence of the alleged error. Therefore, the asserted error was harmless. (See *People v. Jones* (2012) 54 Cal.4th 1, 53 (*Jones*) [alleged error in prior crimes instruction permitting jury to infer intent from prior crimes evidence was harmless where prior crimes evidence was admissible and there was other evidence of intent]; *People v. Foster* (2010) 50 Cal.4th 1301, 1332–1333 (*Foster*) [alleged error in prior crimes instruction allowing jury to infer identity from prior crimes evidence was harmless where prior crimes evidence was admissible and there was other evidence defendant perpetrated charged crimes]; see also *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 329–330; *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1421–1422 (*Rivas*).)

The defendant claims the alleged instructional error, in addition to violating state law, violated his state and federal constitutional rights to due process and a fair trial. "This claim also is without merit. As noted, there was no error in the admission of the [prior conduct evidence]. Any mistake in the related instructions concerning the purpose for which the jury could consider this evidence, would not constitute a violation of defendant's due process rights because the instructions did not 'infect[ ] the entire trial.' " (*Jones*, *supra*, 54 Cal.4th at p. 54.) Indeed, the admissibility of the evidence, the strong evidence of guilt, and the requirement that the jury rely on other evidence to find defendant guilty "lead us to conclude that the instruction did

not corrupt the factfinding process." (*Ibid.*; see *Foster*, *supra*, 50 Cal.4th at p. 1335; *Rivas*, *supra*, 214 Cal.App.4th at pp. 1422–1423.)

3

*CALCRIM No. 852 (Uncharged Domestic Violence)*

The trial court instructed the jury with a modified version of CALCRIM No. 852, the pattern jury instruction concerning uncharged domestic violence. The instruction stated there was evidence the defendant committed uncharged domestic violence against Melissa and J.B. It then informed the jury that when deciding whether the defendant committed murder, it could consider the uncharged domestic violence evidence if it found the defendant committed the uncharged domestic violence. The defendant asserts CALCRIM No. 852 was improper because his prior conduct did not constitute domestic violence.

We previously determined the trial court did not err in finding the prior incidents involving the defendant and Melissa constituted domestic violence. See *ante* Part II.B.2. Based on this determination, we conclude the court's use of CALCRIM No. 852, as well as the instruction's reference to evidence of uncharged domestic violence against Melissa, was proper.

We also conclude the trial court did not err in finding the defendant's prior uncharged conduct towards J.B. constituted domestic violence. As previously noted, Evidence Code section 1109, subdivision (d)(3), defines domestic violence by reference to Penal Code section 13700, which provides that domestic violence is "abuse committed against an adult or a minor who is a … former spouse," and defines abuse as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subds. (a), (b).) It is uncontested

28

J.B. was the defendant's former spouse. Therefore, the determination whether his prior uncharged conduct constitutes domestic violence turns on whether he committed *abuse* against J.B.[7] (Pen. Code, § 13700, subd. (b).)

The trial court properly concluded the defendant's uncharged conduct as to J.B. constituted abuse, and therefore domestic violence, because the uncharged conduct placed J.B. in reasonable apprehension of serious bodily injury to herself or her daughter. J.B. testified that when the defendant threatened to kill her, she believed the defendant's death threat and thought he would use a firearm to accomplish the killing. She testified that when the defendant said his firearm was "for [her]," she thought the implied threat was "very scary," she felt "unsafe," and she "needed to leave." In fact, in response to the defendant's veiled threat against her, J.B. took her daughter, left the defendant, called law enforcement, and obtained a restraining order against the defendant. Further, J.B. testified she was "afraid" when the defendant threw items or punched walls in anger. Because these acts constituted domestic violence, the trial court's jury instruction concerning uncharged domestic violence was proper.[8]

IV

DISPOSITION

The judgment is affirmed.

---

[7] The uncharged prior conduct as to J.B. occurred more than five years prior to the charged offense. Therefore, the definition of domestic violence in Family Code section 6211 does not apply. (See Evid. Code, § 1109, subd. (d)(3).)

[8] The defendant does not dispute that there was sufficient evidence to support a finding, by a preponderance of the evidence, that he engaged in the uncharged conduct specified in CALCRIM No. 852.

McCONNELL, P. J.

WE CONCUR:

AARON, J.

DATO, J.